IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RACHELLE HARRIS, individually and
on behalf of all others similarly situated,

                Plaintiff,                        OPINION AND ORDER

   v.

                                          25-cv-227-wmc

ROEHL TRANSPORT, INC.,

                Defendant.

---

In 2024, defendant Roehl Transport, Inc., hired plaintiff Rachelle Harris under a "Get Your CDL" program, with the cost of the training for the commercial driver's license forgiven if plaintiff continued working for defendant as a truck driver for a specified period. However, after Harris earned her CDL, but before she completed her forgiveness period, Roehl fired her. Roehl then sought to collect the cost of the CDL training from her. On her own behalf and on behalf of a proposed class of former employees, Harris has sued defendant under the Wisconsin Deceptive Trade Practices Act (Count I), Wisconsin Antitrust Act (Count II), and Wisconsin common law prohibiting unlawful penalties (Count III). (Dkt. #38.) Defendant Roehl has moved to dismiss all three claims for failure to state a claim. (Dkt. #39.) For the reasons that follow, the court will deny defendant's motion as to Count I, but dismisses the remaining two counts.

ALLEGATIONS OF FACT[1]

Plaintiff Harris is an Ohio resident who was recruited to work for defendant Roehl,

---

[1] The following facts are drawn from plaintiff's second amended complaint (dkt. #38) and related documents supplied by defendant (namely, plaintiff's employment contracts quoted extensively in

a Wisconsin corporation with its principal place of business in Marshfield, Wisconsin. (Pl.'s Am. Compl. (dkt. #38) ¶¶18, 21.)  In February 2024, Harris applied for the "Safety and Job Skills Training Program (SJSTP) – Get Your CDL."  (*Id.*, ¶ 35.)  Under that program, persons with no experience truck driving can obtain their CDL, then work as a truck driver for Roehl.  (Dkt. #8-1, at 1.)  Roehl's website advertising the program represents that participants "are hired and paid as an employee on day 1" at the very start of their CDL training.  (*Id.*)  After obtaining a CDL, employees are further promised an opportunity to "continue on-the-job training as a long haul truck driver with Roehl."  (*Id.*)

Although the employee would then be a full-time, solo truck driver, the "catch" is that the employee must repay the cost of the CDL training unless they actually drive for Roehl for about 15 months.  (*Id.* at 6.)  Specifically, the website explains:

> We ask for your commitment in exchange for the value of our ["Get Your CDL"] program. The value of the training is in effect a loan to you - a loan you'll never have to pay back if you simply complete the training and work as a heavy duty truck driver for 120,000 solo miles (about 15 months) after your training.  We ask for your formalized agreement and we promise to hold up our end of the deal as well. We'll pay you to GET YOUR CDL, provide you support and additional on the job training you need to be successful as a professional truck driver.

(*Id.*)

As part of her application for the program, Harris was required to sign an "Agreement for the Value of the Safety and Job Skills Training Program – Get Your CDL

---

her complaint).  (Dkt. #40-1, #40-2); *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (at the motion to dismiss stage, the court may consider "the complaint itself, documents attached to the complaint, [and] documents that are critical to the complaint and referred to in it.")

(SJSTP-GYCDL)" ("Agreement"), which she did on February 8, 2024.  (Pl.'s Am. Compl. (dkt. #38) ¶¶ 39, 40.)  That Agreement stated:

> The value of the SJSTP is in effect a loan to you. . . . In return for your admission to Roehl's SJSTP, Roehl will expend on your behalf the value of the SJSTP, which is equal to $7,000.00. . . . By signing this Agreement, you promise to repay to Roehl the value of the SJSTP if you do not complete 120,000 paid solo miles. You are responsible for repayment of these amounts if your employment terminates prior to you completing 120,000 paid solo miles. This debt goes away when you have completed 120,000 paid solo miles.  Otherwise, this debt is all due and payable upon termination of your employment.

(Dkt. #40-2, at 1.)  At the time she signed the Agreement, however, Harris had not yet been officially 'accepted' into the program or given a formal employment offer.  (Pl.'s Am. Compl. (dkt. #38) ¶¶ 42, 43.)

On Feb. 16, Harris next received and signed a "Conditional Employment Offer Letter" that outlined the three phases of the training program.  (*Id.* ¶¶ 51, 55.)  Phase 1 involved learning about "DOT motor carrier rules, trip planning, freight handling, company policies, and how to safely operate a tractor-trailer." (*Id*. ¶ 53; Dkt. #40-1, at 1.)  At the end of Phase 1, participants would receive their CLD-A.  (Dkt. #40-1, at 1.)  Phase 2 involved "partner-driving," and Phase 3 entailed solo truck driving for 120,000 miles in plaintiff's assigned division.  (Pl.'s Am. Compl. (dkt. #38) ¶ 53; Dkt. #40-1, at 1.)  While outlining expectations of the new employee during each phase of training, the letter did not reiterate any portion of the loan terms in the Agreement, including plaintiff's potential obligation to repay the training cost to Roehl if her employment was terminated before completing all three phases of the program.  (Pl.'s Am. Compl. (dkt. #38) ¶ 54; Dkt. #40-1, at 1-3.)

3

Harris started Phase 1 of her training on February 19, 2024, which she completed in March, obtaining her CDL-A. (Pl.'s Am. Compl. (dkt. #38) ¶ 56; Dkt. #40-1, at 1.) Even though she had signed the Agreement, however, Harris alleges she only "became aware that the $7,000 repayment obligation would apply in the event that Roehl fired her" during Phase 1 itself. (Pl.'s Am. Compl. (dkt. #38) ¶ 57.) Harris started Phase 2 on March 15 and Phase 3 on May 14. (*Id.*, ¶¶ 58-59.) Unfortunately, Roehl terminated Harris's employment on May 30, 2024, in the midst of her Phase 3 solo driving. (*Id.* ¶ 60.) To add insult to injury, after terminating her, Roehl then attempted to collect from Harris the $7,000.00 training cost, plus interest, using a third-party debt collector. (Pl.'s Am. Compl. (dkt. #38) ¶ 61.)

Plaintiff now claims that her written Agreement with Roehl was "vague and ambiguous," and that Roehl "obfuscates its collection practices during the recruitment process" in its advertising. (*Id.* ¶ 65.) She further alleges that "no reasonable person" would have agreed to the terms of the Agreement, in which Roehl could fire them and they would still have to repay the training cost, "except out of desperation." (*Id.* ¶ 66.) As a result, she alleges that she and the proposed class members "experienced pecuniary losses in the form of lost wages and other opportunity costs, including foregone employment opportunities with better wages, as a result of Roehl's deceptive practices." (*Id.* ¶ 74.)

Plaintiff also claims that the Agreement is an unreasonable restraint on trade in the labor market. (*Id.* ¶¶ 78-79.) More specifically, she alleges that the Agreement's terms gave Roehl an unfair advantage over competitors by insulating itself from competition for the drivers' services by imposing a penalty on their departure, which "allows them to pay

4

drivers less than they would otherwise earn." (*Id.* ¶ 83.) Thus, she alleges that the Agreement is actually intended dissuade drivers from leaving Roehl to work for its competitors. (*Id.* ¶ 75.)

Finally, plaintiff claims that the repayment Agreement is intended to function as an "unenforceable penalty." (*Id.* ¶ 75.) In support of this claim, she alleges that "Roehl's actual Phase 1 costs (for the part of the program that results in [receipt of] a CDL) comprise less than half of Roehl's total program costs for the GYCDL Training Program[, and] Program participants generate enough revenue for Roehl in just over three weeks of solo driving (approximately the amount of time program participants are expected to spend in Phase 3 of the GYCDL Training Program) to 'pay back' Roehl's per capita Phase 1 costs." (*Id.* ¶¶ 76-77.)

OPINION

Plaintiff's claims against defendant sound under: (1) the Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.20); (2) the Wisconsin "Mini-Sherman" Antitrust Act (Wis. Stat. § 133.03); and (3) Wisconsin common law prohibiting unlawful penalties in employment contracts. Defendant has moved to dismiss all three for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For a claim to survive such a motion, the plaintiff must have provided defendant fair notice of each claim and alleged facts that plausibly suggest entitlement to the relief being sought. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). The court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).

## I.  SUBJECT MATTER JURISDICTION

Before deciding whether plaintiff's complaint states a claim upon which relief may be granted, this court has an independent obligation to confirm that it can exercise subject matter jurisdiction over the case.  *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 731 (7th Cir. 2021).  In particular, despite only asserting state law claims, the court may exercise federal jurisdiction over this putative class action if the complaint alleges with sufficient specificity that: (1) one proposed class member is a citizen of a different state from the defendant; *and* (2) the amount in controversy is more than $5,000,000.  28 U.S.C. § 1332(d).  As for diversity, plaintiff is an Ohio resident and defendant Roehl is incorporated in Wisconsin and principally conducts business from its headquarters in Marshfield, Wisconsin.

To determine the amount in controversy at the pleading stage, a proponent of jurisdiction must first "'explain plausibly how the stakes exceed the amount-in-controversy threshold of [the] jurisdictional statute.'  Second, if the proponent makes that showing, then 'the case belongs in federal court unless it is legally impossible for the plaintiff to recover that much.'"  *Gomez v. Kohl's Corp.*, No. 23-CV-678-JDP, 2024 WL 3363216, at *2 (W.D. Wis. July 9, 2024) (quoting *Ware*, 6 F.4th at 732.)  Here, plaintiff sufficiently alleges that damages for either her Deceptive Trade Practices Act claim (Count I) *or* Antitrust claim (Count II) *could* exceed the jurisdictional minimum.  (Pl.'s Am. Compl. (dkt. #38) ¶¶ 95, 106.)  Therefore, the court will proceed to decide the motion to dismiss on the merits as to each count.

## II. MERITS

A. Wisconsin Deceptive Trade Practices Act Claim (Count I)

Turning then to the merits, plaintiff first claims that defendant's advertisements for the "Get Your CDL" program violated the Wisconsin Deceptive Trade Practices Act (DTPA), Wis. Stat. § 100.20(5), prohibiting certain unfair trade practices as specified in accompanying regulations adopted by the Wisconsin Department of Agriculture, Trade and Consumer Protection ("DATCP"). In particular, plaintiff argues that defendant violated various parts of Wis. Admin. Code § ATCP 116, which generally mandates that an employer make certain affirmative disclosures in job advertisements if recruited employees "must make" a "purchase or investment" before receiving a job offer from the employer. Defendant argues that plaintiff's complaint does not state a claim under § ATCP 116, as plaintiff's alleged employment contract falls outside the scope of the regulation. Even if the regulations apply to plaintiff's contract, defendant further argues that plaintiff fails to allege that the advertisement itself caused her any pecuniary loss, which is required to state a claim under the DTPA. The court will address each of these arguments in turn below.

### 1. Wis. Admin. Code § ATCP 116

Plaintiff first claims that defendant violated Wis. Admin. Code § ATCP 116.02–.05, which states in relevant part that: "A work advertisement shall clearly disclose . . . [t]he nature and amount of every *purchase or investment* that a recruit *must make* in order to obtain a work offer." Wis. Admin. Code § ATCP 116.02 (emphasis added). As to each of

the four regulations at issue, defendant contends that the loan repayment agreement was not a "purchase or investment" that plaintiff was "required to make" before receiving a work offer.

Sitting in diversity, this court "must apply state law as [it] believe[s] the highest court of the state would apply it if the case were now before that tribunal." *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024). Typically this inquiry begins with reference to state case law, but no Wisconsin court has had occasion to interpret these regulations in their current form,[2] so the court relies on principles of Wisconsin statutory interpretation to make an "*Erie* guess" as to whether the Wisconsin Supreme Court would allow the claim. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 519 (7th Cir. 2021) (citing *Erie Railroad. v. Tompkins*, 304 U.S. 64, 78 (1938)).

"[W]hen interpreting administrative regulations," the Wisconsin Supreme Court "use[s] the same rules of interpretation as [they] apply to statutes." *DaimlerChrysler v. Lab. & Indus. Rev. Comm'n*, 2007 WI 15, ¶ 10, 299 Wis. 2d 1, 13. Thus, to interpret a Wisconsin regulation as the Wisconsin Supreme Court would, this court begins with the "*intrinsic sources*" that are "primary in determining the plain meaning" of the regulation, including "the statutory text at issue, related statutes and phrases, a statute's place within the

---

[2] The Wisconsin Court of Appeals interpreted whether requiring an employee to make purchases to establish a home office was a "purchase or investment" under the previous version of the rule, in which "purchase or investment" was not defined. *Schinker v. Farmers Ins. Exch.*, 156 Wis. 2d 466, 1990 WL 95987 (Ct. App. 1990). The court concluded that the home office requirement was not a "purchase or investment" within the meaning of the rule, as the employee was not required to pay *the employer*, but rather third parties, through purchases over which he retained complete control. *Id.* at *5-*6. The current rule defining "purchase or investment," promulgated in 1996, tracks this decision but supersedes it. (Dkt. # 22-1, Order of the Wis. Dept. of Agriculture, Trade, and Consumer Protection, Repealing and Recreating Rules, at 2 (May 30, 1996).)

statutory structure, its stated or textually manifest purpose, and statutory history." *Serv. Emps. Int'l Union Healthcare Wis. v. Wis. Emp. Rels. Comm'n*, 2025 WI 29, ¶ 8, 416 Wis. 2d 688, 694 (hereinafter "*SEIU*") (emphasis added). Secondarily, the court may turn to *extrinsic* sources "to confirm that plain meaning or resolve any ambiguity," including "items of legislative history." *Id.*

To start, the court must determine whether plaintiff states a claim that the repayment Agreement is a "purchase or investment" under the express terms of the regulation. Under Wis. Admin. Code § ATCP 116.01(5), a "'purchase or investment' means *any* arrangement *involving a direct* or indirect *payment* from a recruit to a recruiter" (emphasis added). This definition "includes . . . *a contract to make* a purchase or investment." Wis. Admin. Code § ATCP 116.01(5)(c) (emphasis added). Taken together, therefore, the plain language of § 116.01(5) and (5)(c) defines a "purchase or investment" to include "a contract to make" "a direct. . . payment from a recruit to a recruiter." Thus, applying the plain text of the regulation, plaintiff states a claim that the repayment Agreement *is* a "purchase or investment" by alleging that the repayment obligation contractually bound her to make a direct payment of $7,000 in cash as the recruit, to defendant, as the recruiter, *or* pay it back in future services.

In response, defendant argues that the regulation limits a "purchase or investment" only to one requiring a recruit to *pay* the recruiter *before* receiving a work offer. With that reading, defendant argues the regulation does not apply to the repayment Agreement, as it *only obligated plaintiff to pay* the training cost *after* her employment terminated. However, this position is contradicted by the plain text of the regulation itself, which defines a

9

"purchase or investment" to include a binding promise or *contract to make a payment from a recruit to a recruiter*, that the recruit must make in order to obtain a work offer. Wis. Admin. Code § ATCP 116.01(5), (5)(c).

Here, plaintiff alleges she was required to sign the Agreement obligating her to pay $7,000 to defendant as part of her application to obtain a work offer. The text of the regulation does not indicate that plaintiff must *perform* the contract before starting work in order to state a claim. Instead, as plaintiff notes, the language of the regulation defining "purchase or investment" contemplates future or post-hire payment from recruit to recruiter. Wis. Admin. Code § ATCP 116.01(5)(b) ("financial obligation incurred"); 116.01(5)(c) ("contract to make a . . . payment"); 116.01(5)(d) ("a deposit"). In this way, plaintiff sufficiently alleges that the repayment Agreement is a "purchase or investment" under the text of the regulation.

This interpretation is also "confirmed by" the Wisconsin Department of Agriculture, Trade, and Consumer Protection's expression of regulatory intent. *SEIU*, 2025 WI 29, ¶ 8; (Dkt. #22-1, Order of the Wis. Dept. of Agriculture, Trade, and Consumer Protection, Repealing and Recreating Rules, at 2 (May 30, 1996)). Specifically, in adopting the rule into its current format, the DATCP expressed its intent to expand the rule's scope. (Dkt. #22-1, at 2.) Indeed, the rule was previously limited to recruitment schemes requiring workers to purchase "goods" before obtaining an offer, but now, more broadly includes any "recruitment schemes that are aimed at getting money from job applicants, not just recruiting them as workers," "regardless of the work for which they are recruited." (*Id.*) While this "extrinsic" information is secondary to the court's

10

consideration of the rule's plain meaning in accordance with the Wisconsin Supreme Court's interpretive methodology, this regulatory history demonstrates the intended breadth of the rule and helps confirm the court's conclusion based on intrinsic sources that plaintiff has sufficiently alleged the required repayment under the Agreement falls comfortably into the definition of "purchase or investment" as defined by the regulation's text. *SEIU*, 2025 WI 29, ¶ 8.

Next, the court turns to defendant's argument that plaintiff was not "required" to sign the repayment Agreement in order to receive a work offer from defendant. *See* Wis. Admin. Code § ATCP 116.02 ("A work advertisement shall clearly disclose. . . the nature and amount of every purchase or investment that a recruit *must make* in order to obtain a work offer. . .") (emphasis added); § ATCP 116.03 ("If a recruit is *required to make* a purchase or investment in order to obtain a work offer. . .") (emphasis added).  On the face of the complaint, plaintiff alleges that she was *required* to sign the repayment Agreement in order to obtain a work offer from defendant.  In particular, she alleges (and defendant's records appear to reflect) that she was expected to sign the repayment Agreement as a condition of her application for the job, a full week before she received a conditional offer letter. (Pl.'s Am. Compl. (dkt. #38) ¶¶ 40, 51, 55.)

Nonetheless, defendant argues that plaintiff fails to allege that she was "required" to sign the repayment Agreement, because the advertising materials for the position note that she could have obtained her CDL elsewhere, *then* applied for a long-haul trucking job with defendant.  While that may be true for another employee, plaintiff sufficiently alleges that the job *she* applied for *required* her to sign the Agreement before receiving an offer, such

11

that she states a claim under the text of the regulation.  Of course, the burden remains on plaintiff to prove this as a matter of fact.

Defendant's argument that plaintiff was not "required" to repay the training cost because the loan was "conditional" is even less unpersuasive.  Even if future forgiveness of the training cost was possible after plaintiff drove 120,000 miles for defendant *and* defendant itself chose to retain plaintiff, she has still sufficiently alleged a *requirement* to sign the repayment Agreement expressly obligating her to pay defendant $7,000 before receiving a job offer.  There is no textual basis to limit such a "requirement" under the regulation only to a debt that could never be forgiven.  Finally, again, this interpretation also accords with regulatory history, since the Department intended to *expand* the scope of the regulation to recruitment schemes aimed at obtaining money from job applicants.  (*See* dkt. # 22-1, at 2.)  Overall, because plaintiff sufficiently alleges that she was "required" to make a "purchase or investment" before obtaining a work offer, defendant's recruitment scheme appears to be encompassed within the plain text of Wis. Admin. Code. § ATCP 116.

### 2.  Causal Connection

Even if § ATCP 116 applies to plaintiff's debt, defendant further argues she has failed to allege defendant's advertising itself *caused* plaintiff's pecuniary loss, but rather the face of her complaint acknowledges that plaintiff's failure to drive the mileage required for loan forgiveness was the actual cause of her pecuniary loss.  Under the DTPA, however, "the test ... for determining whether a representation caused pecuniary loss is '[w]hether

12

plaintiff would have acted in its absence.'" *Grand View Windows, Inc. v. Brandt*, 2013 WI App 95, ¶ 21, 349 Wis. 2d 759, 773 (citation omitted).  Here, plaintiff also sufficiently alleges that defendant's advertising caused her pecuniary loss, as the court can reasonably infer from the face of her complaint that she would *not* have applied for the position had defendant sufficiently disclosed the financial obligation she would be incurring if selected for the program, as she includes that:  (1) "no reasonable person" would have accepted defendant's offer had she known its full terms; and (2) her losses included forgone wages from other positions she could have pursued instead.  (Pl.'s Am. Compl. (dkt. #38) ¶¶ 65, 66, 74.)  Again, the burden will be on plaintiff to prove this, but she has satisfied the requirement of notice pleading at this point.

### 3.  *Heder* and *Milford*

Finally, defendant argues that *Heder v. City of Two Rivers*, 295 F.3d 777 (7th Cir. 2002), and *Milford v. Roehl Transp., Inc.*, No. 22-CV-0879-BHL, 2023 WL 2503495 (E.D. Wis. Mar. 14, 2023), preclude plaintiff's DTPA claim entirely.  However, these two cases deal with *distinct* causes of action under statutes unrelated to plaintiff's DTPA claim. Specifically, those cases arise out of alleged violations of the Fair Labor Standards Act, Wisconsin wage and hour laws, Wis. Stat. § 103.465 (limiting use of restrictive covenants), and Wis. Stat. § 100.18 (a separate DTPA provision).  These decisions do not apply Wis. Admin. Code § ATCP 116, nor support the general proposition that defendant's recruitment scheme is permissible under all Wisconsin law.  Accordingly, defendant's motion to dismiss Count I of plaintiff's second amended complaint is denied.

13

### B.  Wisconsin Antitrust Claim (Count II)

Plaintiff next alleges that her employment contract with defendant functions as an unreasonable restraint on competition in the labor market in violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1).  Under the Act, which mirrors the federal Sherman Act, "every contract … in restraint of trade or commerce is illegal." Wis. Stat. § 133.03(1).[3] While Wisconsin law expressly controls under the parties' Agreement, "the Wisconsin Supreme Court has long made clear that federal interpretations of the Sherman Act should guide interpretation of the Wisconsin Act." *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 889 (7th Cir. 2025).  Looking to the federal standard, an antitrust claim for unreasonable restraints of trade must include three elements: (1) a contract, combination, or conspiracy; (2) a resultant, unreasonable restraint of trade in a relevant market; and (3) an accompanying antitrust injury.  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021).

As for the first element, plaintiff's complaint sufficiently alleges that she and defendant signed a "contract" that falls under the statute.  However, defendant asserts under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984),  that a contract between an employer and employee cannot state an antitrust claim.  However, *Copperweld* held that

---

[3] For this statute to reach interstate commerce, the alleged "actionable conduct, such as the formation of a [contract,] combination or conspiracy, [must have] occurred within this state, even if its effects are felt primarily outside Wisconsin." *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 1, 284 Wis. 2d 224, 229.  Without deciding, the court will infer that plaintiff sufficiently alleges *in-state* "actionable conduct," such that the Wisconsin Antitrust Act applies to the claim, based on allegations that:  one of the parties to the repayment Agreement is a Wisconsin corporation; the contract between the parties is governed by Wisconsin law; and performance of the contract involves sending payments to Wisconsin.  *Id.*; *see also* (dkt. #14-2) (the Agreement "shall be governed by and construed and interpreted in all respects in accordance with the internal laws of the State of Wisconsin," and a Wisconsin forum is required to enforce the agreement).

a corporation and its wholly owned subsidiary cannot "conspire" to restrain trade, as they are completely aligned in interests. *Copperweld* and successive cases following its reasoning have no application to an employer/employee relationship, which have distinctly, unaligned financial and philosophical interests, just as employers and unions do. For example, in signing her employment contract with defendant, plaintiff was agreeing to provide her own labor, in her own interest. She was certainly *not* acting as defendant's agent, in alignment with defendant's interests. *See Medline Indus., Inc. v. Diversey, Inc.*, 563 F. Supp. 3d 894, 926–27 (E.D. Wis. 2021) (where employee "was acting as an agent of, and in the interest of [his *employer*], [employee] could not have conspired with [employer]" in the antitrust context). As *Copperweld* is not implicated here, plaintiff sufficiently alleges the "contract" element of an antitrust claim.

As for the second and third elements, an argument can also be made that an employment contract creates a restraint of trade, causing an antitrust injury prohibited by § 133.03(1). The hallmark of a "restraint on trade" under both the Wisconsin and federal standards is, however, that the restraint "significantly impacts competition" in the relevant market. *Indep. Milk Producers Co-op v. Stoffel*, 102 Wis. 2d 1, 8 (Ct. App. 1980); *see also Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 866 (7th Cir. 2025) (whether a challenged restraint is permissible under "the Sherman Act depends on its effect on competition"). The restraint must also be unreasonable, and "reasonableness is determined by reference to the purpose of the restraint, the market power of the party who benefits from the restraint, and the anticompetitive effect of the restraint." *Grams v. Boss*, 97 Wis.2d 332, 348 (1980).

15

Here, plaintiff characterizes defendant's repayment clause in the parties' Agreement as a restrictive covenant (or a substantial penalty that functions as a restrictive covenant), because that clause restrains employees' ability to leave defendant's employment and "insulat[es] defendant from competition on these drivers' services by holding debt over them." (Pl.'s Compl. (dkt. #38) ¶ 73.)  At the same time, that Agreement allows defendant to terminate plaintiff at-will.  (*Id.*)  A distinct Wisconsin statute, Wis. Stat. § 103.465, also prohibits unreasonable restrictive covenants in employment contracts.  While the factors that courts use to assess the "reasonableness" of a restrictive covenant under § 103.465 vary somewhat from the factors used in the "rule of reason" assessment under § 133.03(1), the validity of a restrictive covenant under § 103.465 ultimately depends on whether the provision "allows for the ordinary sort of competition attendant to a free market." *Manitowoc Co., Inc. v. Lanning*, 2018 WI 6, ¶ 35, 379 Wis. 2d 189, 209.  If not, the restrictive covenant is considered a "unreasonable restraint of trade" in the market for labor, and the clause is invalid.  *Id.*; *Heyde*, 2002 WI 131, ¶ 13.

Conceptualizing a restrictive covenant in an employment contract as a "restraint of trade" has garnered criticism,[4] and other states have delineated between the two tests to avoid just such an overlap.[5]  Under Wisconsin law, however, the inquiry is the same: the validity of a restrictive covenant under § 103.465 or a restraint of trade under § 133.01,

---

[4] *Manitowoc Co.*, 2018 WI 6, ¶¶ 100-101 (Roggensack, J., dissenting).

[5] *See Garcia v. Dallas Cnty. Hosp. Dist.*, --- S.W. 3d. ----, 2025 WL 3012830, at *4 (Tex. App. Oct. 28, 2025) ("The two standards are not directly related. . . . [A restrictive covenant] may be unreasonable as between the parties and yet not violate the rule of reason test under the antitrust laws.") (citation omitted).

as applied to an employment contract, both depend on the effect on competition in the marketplace for labor. *Manitowoc Co.*, 2018 WI 6, ¶ 35; *see also Lakeside Oil Co. v. Slutsky*, 8 Wis. 2d 157, 161, 98 N.W.2d 415, 418 (1959) (assessing the validity of a restrictive covenant under both § 133.01 and § 103.465).

As such, analysis of restrictive covenants under § 103.465 provides significant instruction. In particular, the Seventh Circuit assessed whether a similar training repayment agreement was an unreasonable restrictive covenant under § 103.465 in *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777 (7th Cir. 2002). There, a firefighter alleged that his contract contained an unreasonable restrictive covenant by requiring that he repay the costs for paramedic training if he left the position before completing three years of employment. *Id*. at 780. The Seventh Circuit held that the clause was permissible under § 103.465:

> A covenant not to compete must be linked to competition. …. But the agreement between [the employer] and the [employee] does not restrict [the employee's] ability to compete against the [employer] after leaving its employ. The obligation is unconditional: a firefighter departing before three years have expired must repay training costs even if he goes back to school, changes occupation, or retires. Competition has nothing to do with the matter.

*Id.*

Likewise in this case, plaintiff does not allege that the repayment Agreement would penalize her for working *for a competitor*, specifically; nor does she allege facts sufficient to infer such a specific penalty. On the contrary, the complaint alleges that plaintiff was obligated to repay the training cost *in any scenario* in which her employment ended, just as in *Heder*. And although plaintiff alleges that the repayment Agreement "insulat[es]

17

defendant from competition on drivers' services by holding debt over them" (Pl.'s. Am, Compl. (dkt. #38) ¶ 83), plaintiff does *not* allege that anything in the repayment Agreement would prevent plaintiff from finding work with another trucking company who, for example, would pay the debt or offer a high enough salary to offset the debt. Similarly, nothing in the parties' Agreement precludes plaintiff from using her CDL-A received in the program to work for another trucking company. Finally, again as in *Heder*, "the parties do not cite, and we could not find, any Wisconsin decision that characterizes the kind of incentives [applicable to such a training program] as restrictive covenants." *Heder*, 295 F.3d at 781.

Plaintiff attempts to distinguish *Heder* by pointing out that here, defendant could unilaterally decide to terminate an employee before she completed the mileage required to forgive her training cost. Nonetheless, where an employer trains an employee for a portable credential while simultaneously paying them, the Seventh Circuit has noted that "employees receive[] considerable benefits as a result: training that will be useful for years to come," as well as payment throughout. *Id.* at 781. While defendant could fire the plaintiff, plaintiff's allegations describe an arrangement that is analogous to an at-will employment contract, which includes a non-refundable fee for training for a portable credential. As the *Heder* court concluded, "if that system is lawful [under § 103.465], as it is, then the economically equivalent system that [defendant] adopted must be lawful." *Heder*, 295 F.3d at 781–82. Although here, the employer could terminate the employee at-will, *Heder*'s reasoning nonetheless applies. Just as in *Heder*, "the cost of training equates to the loan, repayment of which is forgiven after [the specified time]."

18

However, plaintiff also alleges that the cost of the training was *not* equivalent to the loan amount, asserting that the training provided defendant could not be valued at $7,000.[6] Even inferring that plaintiff did not "receive[] the benefit of her bargain," or that she could raise this as a "potential defense to the enforcement of the contract" or grounds for its invalidity under common law, *Milford v. Roehl Transp., Inc*, No. 22-CV-0879-BHL, 2023 WL 2503495, at *4 (E.D. Wis. Mar. 14, 2023) (citing *Bland v. Edward D. Jones, & Co*, 375 F. Supp. 3d 962, 977-78 (N.D. Ill. 2019), *Heder* explains that the cost of the training program itself still does not restrict the employee's or other employer's ability to compete in the labor market:  "True enough, [the] repayment obligation shares with genuine restrictive covenants the feature that it makes changing jobs costly.  But that is not enough to throw a contract out the window."  295 F.3d at 780.

In the end, plaintiff cites only one case, *Manitowoc Co.*, 2018 WI 6, to support her assertion that the Agreement here acts as a restrictive covenant.  However, that case dealt with a contract provision expressly preventing an employee from working *for an industry competitor*, and that case did not concern a training repayment agreement like plaintiff's. *Id.*, ¶ 34.  Indeed, the holding in *Manitowoc Co.* applying Wis. Stat. § 103.465 does *not* even support plaintiff's position that a repayment agreement is a restraint on trade.  As for the other cases that plaintiff cites addressing restrictive covenants that imposed a flat cost on an employee *when he chose to compete in the same field of employment* after leaving his employer—

---

[6] From the face of the complaint, plaintiff does not specifically allege that a $7,000 fee is unreasonable compared to charges for other similar CDL-A training programs available on the market, while defendant argues that a $7,000 program fee is within the market range for a comparable program.  However, that would seem an issue for the trier of fact.

rather than imposing an unrestricted obligation to repay a training cost—each is plainly inapposite on their face. *See Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381 (Tex. 1991); *Bires v. WalTom*, LLC, 662 F. Supp. 2d 1019 (N.D. Ill. 2009). Even the case that plaintiff cites that lends her the *most* support, holding that a plaintiff stated a claim under Texas statutes limiting unreasonable restrictive covenants in employment contracts, *Fredericks v. Ameriflight, LLC,* No. 3:23-CV-1757-X, 2024 WL 1183075, at *5 (N.D. Tex. Mar. 19, 2024), falls well short of the mark, since unlike Wisconsin, Texas assesses unreasonable restrictive covenants in employment contracts and antitrust restraints on trade in distinct ways. *See Garcia v. Dallas Cnty. Hosp. Dist.*, --- S.W. 3d. ----, 2025 WL 3012830, at *4 (Tex. App. Oct. 28, 2025) (describing the difference between Texas's tests for unreasonable restrictive covenants in employment contracts and antitrust restraints on trade).

Ultimately, since Seventh Circuit precedent squarely holds that a training repayment contract does not restrict competition under Wis. Stat. § 103.465, this court holds the same, finding that plaintiff fails to state a claim that the Agreement is an unreasonable restraint of trade under § 133.03(1). Moreover, as no Wisconsin state court has addressed a training repayment agreement in an antitrust context, the court declines to recognize plaintiff's relatively novel application of Wisconsin's antitrust law. *See Green Plains*, 90 F.4th at 929 ("our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court") (quoting *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987)).[7]

---

[7] Other courts that have been asked to apply state antitrust statutes mirroring the federal Sherman

20

## C. Unlawful Penalty Claim (Count III)

Plaintiff alternatively requests a declaration as a matter of law that the $7,000 repayment obligation is an unlawful penalty.  Under Wisconsin common law, "a clause in [an] employment contract stipulating damages is [either] a valid and enforceable liquidated damages provision or is, as a matter of public policy, an unenforceable penalty."  *Wassenaar v. Panos*, 111 Wis. 2d 518, 528 (1983); *see also* Restatement (Second) of Contracts § 356(1) (1981) (describing a penalty as "a term fixing unreasonably large liquidated damages," that "is unenforceable on grounds of public policy").  Then Wisconsin Supreme Court Chief Justice Shirley Abrahamson described the competing interests behind stipulated damages clauses, explaining that stipulated damages clauses "allow the parties to control their exposure to risk by setting the payment for breach in advance," but that such clauses run the risk of "punishing the breaching party," instead of allocating "compensat[ory damages] for the nonbreaching party."  Thus, a stipulated damages clause is triggered by a breach, that then awards agreed-upon damages to the nonbreaching party.

In this case, plaintiff fails to allege that her breach of her employment contract triggered the $7,000 repayment obligation.  Rather, participating in defendant's training

---

Act to training repayment agreements similarly found that they do not restrict competition.  *See McFalls v. NCH Healthcare Sys., Inc.*, No. 2:23-CV-572, 2024 WL 111920, at *3–4 (M.D. Fla. Jan. 10, 2024) ("While Plaintiff claims that the training program fee agreement is a restraint on trade, the Court is not convinced that it is the type of agreement envisioned by § 542.18[, Florida's state equivalent of the Sherman Act].  The surrounding provisions show that the Florida legislature's use of the term 'restraint on trade or commerce' was a reference to contracts that 'restrict or prohibit competition.' The parties' agreement here does not restrict competition. Plaintiff is free to work elsewhere without limitation. So the statute is inapplicable."); *USS-Posco Indus. v. Case*, 244 Cal. App. 4th 197, 210, 197 Cal. Rptr. 3d 791, 802 (2016) ("Repayment of the fronted costs of a voluntarily undertaken educational program, the benefits of which transcend any specific employment and are readily transportable, is not a restraint on employment").

21

at the outset of her employment triggered the repayment obligation.  The court agrees with defendant that the structure of the repayment Agreement does not resemble a liquidated damages clause triggered by a future breach, and therefore, finds that plaintiff has also failed to state a claim that the repayment clause in the Agreement acts as an unlawful penalty under Wisconsin common law.

## ORDER

IT IS ORDERED that:

1) Defendant Roehl Transport, Inc.'s renewed motion to dismiss for failure to state a claim (dkt. #39) is DENIED as to Count I, the Wisconsin Deceptive Practices Act claim.

2) Defendant Roehl Transport, Inc.'s renewed motion to dismiss for failure to state a claim (dkt. #39) is GRANTED as to Counts II and III, the Wisconsin Antitrust claim and Unlawful Penalty claim, respectively.

Entered this 29th day of May, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

22