**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| RACHELLE HARRIS, individually and on behalf of all others similarly situated, Plaintiff, | Civil Action No. 3:25-cv-00227-wmc |
| v. | |
| ROEHL TRANSPORT, INC., Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLASS**

## TABLE OF CONTENTS


**I. Introduction ..... 3**

**II. Relevant Facts ..... 5**

A. Driver Recruitment ..... 5

B. On-the-Job CDL Training Program ..... 7

C. Collections ..... 8

D. Advertisements and Written Documents: Lack of Disclosure ..... 9

E. Advertisements and Written Documents: Affirmative Representations ..... 11

**III. Legal Standard ..... 12**

**IV. Class certification is warranted under Rule 23(a). ..... 13**

A. The proposed class is too numerous for practicable joinder. ..... 13

B. Common questions are central to the validity of each claim. ..... 14

C. Plaintiff's claims are typical of the claims of those she seeks to represent. ..... 19

D. Plaintiff and her counsel are more than adequate representatives of the class. ..... 20

**V. The requirements of Rule 23(b)(3) are satisfied ..... 21**

A. The numerous common issues in this litigation will predominate over any individualized inquiries. ..... 21

1. Plaintiff will be able to establish class-wide pecuniary losses using common evidence. ..... 23

a) Purchase price ..... 25

b) Expectation damages (lost wages resulting from early termination by Roehl) 25

c) Difference-in-value damages ..... 27

d) Suppressed wages ..... 29

2. Plaintiff will be able to establish that Roehl's violations of ATCP § 116 caused pecuniary loss using common evidence. ..... 30

B. A class action is superior to other methods of adjudicating this matter. ..... 33

**VI. Conclusion ..... 35**

## I. Introduction

Plaintiff Rachelle Harris was fired by Roehl Transport without being allowed to complete Roehl's Safety and Job Skills Training Program – Get Your CDL (hereinafter, "On-the-Job CDL Training Program" or "CDL Training Program"). Despite her best efforts and willingness to continue to drive for Roehl, she now owes Roehl more than $7,000, which is reflected on her credit report, because she was not allowed to meet her mileage commitment. Harris is not alone. Thousands of individuals have been put in this same predicament by Roehl: terminated by Roehl, prevented from completing their mileage requirement, in debt to Roehl for $7,000, and faced with the choice of either paying the $7,000 or becoming subject to collections actions, resulting in an increase in the amount of debt (up to $8,332) and damage to their credit reports. Roehl, meanwhile, benefits from this predicament, because it has a steady pool of drivers who are locked into mileage-based contracts with a $7,000+ penalty motivating them to finish their miles (even if they are having a hard time making ends meet). And, if Roehl does not have enough work for this pool of drivers due to changes in the market, it can fire them and make money off of them at the same time.

Roehl claims it can demand $7,000 – from drivers that it has fired – based on an agreement that it has drivers sign at a surprising point in time: during the online application process for the "On-the-Job CDL Training Program Truck Driving Job" (hereinafter, "CDL Training Job"), among many other standard pre-employment authorizations and disclosures, before the drivers are even hired. If drivers do not complete the entire program by driving 120,000 miles for Roehl (which typically takes approximately 15 months), no matter the reason, they immediately owe $7,000, as well as interest "at the maximum rate allowed by law starting on your separation date" and collection costs.

Roehl's recruitment and hiring practices for the CDL Training Job are subject to regulations, promulgated by the Wisconsin Department of Agriculture, Trade and Consumer Protection, pursuant to its authority under Wis. Stat. § 100.20(2), and codified in the form of ATCP § 116. As this Court recognized in its motion to dismiss decision, the purpose of the current version of ATCP § 116 was "to expand the rule's scope" from protecting sales employees required to buy the products they were recruited to sell, to "more broadly" protecting "job applicants [subject to recruitment schemes aimed at getting money from them, not just recruiting them as workers] . . . <u>regardless</u> of the work for which they are recruited." Op. and Order at 12, *Harris v. Roehl Transport, Inc.*, No. 25-CV-227-WMC (W.D. Wis. May 29, 2026), ECF No. 44 (emphasis added), *citing* Order of the Wis. Dept. of Agriculture, Trade, and Consumer Protection, Repealing and Recreating Rules, at 2 (May 30, 1996) ("1996 Order") (expressing intent to "strengthen and clarify" the prior rules).

The rules were strengthened by, *inter alia*: defining "purchase or investment" and "work advertisement"; requiring work advertisements to "clearly disclose" the "nature and amount of every purchase or investment that a recruit must make in order to obtain a work offer"; requiring the "purchase or investment" to be detailed in a <u>written</u> document that must be provided to the recruit "<u>before</u> the recruit agrees to make the purchase or investment," which document must include, *inter alia*, "the consideration given by the recruiter in return for the purchase or investment," and "[t]he terms and conditions of any work offer to which the purchase or investment is related"; requiring statements of earnings potential to be accompanied by required disclosures; and prohibiting certain practices, e.g., making "false, deceptive, or misleading representations." 1996 Order, at 2-5.

On March 26, 2025, Plaintiff filed this case against Roehl as a putative class action, asserting claims brought pursuant to Wis. Stat. § 100.20(5), based on Roehl's violations of ATCP § 116.[1] Plaintiff now seeks to certify a class, pursuant to Rule 23(b)(3), consisting of "all individuals who have been hired into Roehl's On-the-Job CDL Training Program Truck Driving Job and have been terminated by Roehl after obtaining their CDL and before completing 120,000 miles, since March 26, 2022."

## II. Relevant Facts

Roehl is a nationwide truckload carrier with dry van, refrigerated, and flatbed capacity, primarily operating east of the Rockies. Norlin Dep. [Ex. 1] 17:18-19:16.[2] At any given time, Roehl employs approximately 2,200 drivers, *id.* 16:04-17:17, and Roehl must compete with other truckload carriers in order to hire and retain that number of drivers, *id.* 20:15-17. Because Roehl is "definitely not the highest-paying carrier out there," which it knows from market analysis and driver wage studies, it tries to distinguish itself through its reputation for safety, benefits, and family-like atmosphere. *Id.* 20:21-23:3.

### A. Driver Recruitment

Roehl recruits and hires thousands of drivers each year who do not already possess a commercial driver's license through its On-the-Job CDL Training Program. *Id.* 17:11-17. During Phase 1 of the program, drivers obtain their CDL. Def.'s 1st Am. Answers to Interrog. No. 2 [Ex. 2]. Roehl also recruits and hires drivers who have already obtained their CDL but do not have job experience, which it puts through a version of its On-the-Job Training Program for recent graduates. *Id.,* No. 1. Approximately half of Roehl's drivers at any given time are On-the-Job

---

[1] Plaintiff also asserted claims under the Wisconsin antitrust statute and common law, which were dismissed by this Court on May 29, 2026. ECF No. 44.

[2] Exhibit 1 is filed as a separate docket entry. All other referenced exhibits are attached to the Declaration of Rachel Smit, filed separately.

Training Program drivers. Norlin Dep. [Ex. 1] 16:04-17:17. Roehl's training programs are "an important component" of Roehl's overall recruitment plan. *Id.* 25:6-26:15.

Roehl employs a group of recruiters dedicated to recruiting for the On-the-Job Training Program jobs, which is managed by an individual who reports directly to Roehl's Vice President of Driver Employment, Tim Norlin. *Id.* 10:17-10:23, 13:1-14:5. All potential applicants – whether initially contacted through social media or job boards – are ultimately directed to www.roehl.jobs, which is the only website where individuals can submit an application for the CDL Training Job. *Id.* 48:4-14; Roehl Jobs Site [Ex. 3]. The website contains information about the job and the training offered. It is reviewed by Roehl's recruitment team every six months or so "for relevance and accuracy," but the structure and format of the website have been in place since 2017, when the VP of Driver Employment joined Roehl. Norlin Dep. [Ex. 1] 48:24-50:2. Any other written recruiting materials for the CDL Training Job, i.e., "job posts on Indeed or Google for Jobs, et cetera" are "derivative" of the content on www.roehl.jobs. *Id.* 60:4-10.

The first step for all applicants who apply for the CDL Training Job is to review and accept and/or sign a series of disclosures, specifically a Federal FCRA [Fair Credit Reporting Act] Summary of Rights Acknowledgment, PSP [FMCSA Pre-Employment Screening Program] Disclosure and Authorization, FCRA Disclosure, FCRA Authorization, Employment Verification Acknowledgment and Release (DOT Drug and Alcohol), Clearinghouse Release, Summary of Rights Under 15 U.S.C. Section 1681m(a), and Investigative Consumer Report Disclosure. *See* Harris Application [Ex. 4]; Norlin Dep. [Ex. 1] 70:5-78:14.

Immediately before signing the last disclosure, the applicant must sign an "Agreement for the Value of the Safety and Job Skills Training Program - Get Your CDL." Harris Agreement

[Ex. 5]; Norlin Dep. [Ex. 1] 70:5-78:14. All of these documents are signed during the application process, before the individual is hired by Roehl.

Applications submitted on the website are tracked through Tenstreet, a computer application used by Roehl's recruiting group on a daily basis, and which can be used to generate custom reports. *Id.* 39:20-42:1, 46:16-24. Once an applicant submits an application, she is contacted by a recruiter, who uses standard-form emails to communicate with the recruit. Norlin Dep. [Ex. 1] 85:20-91:14. The recruiter sets up an interview with the applicant, Interview Reminder [Ex. 6], which follows standardized guidelines, Norlin Dep. 52:18-53:15.

After the interview, the recruiter directs the applicant to complete drug testing. Authorizations [Ex. 7]. Then a recruiter directs the applicant to register for the federal Drug and Alcohol Clearinghouse. DACH Registration Process [Ex. 8].

Lastly, upon confirmation of the applicant's choice of orientation start dates, the applicant is sent a "Conditional Offer Letter," which is also a standardized. Harris Offer Letter [Ex. 9]; Norlin Dep. 89:7-101:13.

### B. On-the-Job CDL Training Program

Roehl's On-the-Job CDL Training Program consists of three phases. Recruits to the program are formally hired by Roehl during the first week of Phase 1, at which point they are put on payroll. Phase 1 lasts three weeks and is intended to result in the recruit obtaining a Class A CDL. During Phase 2, recruits are assigned a driver trainer and are sent out over-the-road to pick up and deliver freight for an estimated 19 to 26 days, or until the driver trainer certifies that the driver is ready to go solo. [Ex. 2] Answer No. 2. During Phase 3, drivers are supervised remotely by a Fleet Training Manager, and are paid a mileage rate, per the pay scale emailed to the driver

during recruitment. *Id.* Phases 2 and 3 of the program are identical for individuals obtaining their CDL and recent graduates.[3]

### C. Collections

If Roehl terminates a driver's employment at any point after the driver obtains a CDL, but before completing 120,000 miles, Roehl asserts that the driver immediately owes Roehl $7,000, and seeks to collect on that amount. Norlin Dep. [Ex. 1] 160:24-161:19. If the debt is not paid, Roehl begins collection proceedings. Template Agreement at 7 [Ex. 11] ("you understand and agree that Roehl will immediately begin collection proceedings to recover the entire unpaid balance"). These accounts are turned over to third party debt collectors, and the collection accounts get reported to the national credit reporting agencies; for example, the account appears on Plaintiff Harris's credit report as a $8,332 collections account, which is past due. Harris Credit Report [Ex. 12].

Roehl stores collections data in a system called the Great Plains Financial Collections, used by Roehl's finance group. Def.'s 1st Am. Answer to Interrog. No. 21 [Ex. 2]; Norlin Dep. [Ex. 1] 43:4-6. According to records produced by Roehl in the course of this litigation, between March 26, 2022 (three years prior to the filing of the complaint), and December 1, 2025, approximately 1,646 drivers were terminated from the CDL Training Program after obtaining their CDL but before completing 120,000 miles. Smit Decl. ¶ 10. These same drivers incurred approximately $11.5 million in debt, of which Roehl had successfully collected approximately $ $1.3 million as of December 1, 2025. *Id.* ¶¶ 11-12. Approximately 1,502 of these drivers had

[3] Norlin Dep. [Ex. 1] 31:5-18 ("Get Your CDL really is three phases. The Phase 1 is the [] three weeks of [] training to obtain the CDL, and then the Safety and Job Skills Training program is Phase 2 and 3 of that program, and that would apply to both Get Your CDL employees and those that just recently graduated from a CDL school and have come to Roehl."); Driver Reference Guide [Ex. 10] ("After completing the GYCDL or Student programs, new driving teammates move on to Phase 2").

made some payment, no matter how small, to Roehl as of December 1, 2025, and approximately 144 drivers had not made any payments. *Id.* ¶ 13.

### D. Advertisements and Written Documents: Lack of Disclosure

Nowhere on the www.roehl.jobs website does Roehl disclose the fact that participants in the On-the-Job CDL Training Program will immediately owe Roehl $7,000 or more if they fail to drive 120,000 miles for Roehl. Rather, the website uses vague language with no dollar value specified:

> **Roehl Agreement – What's the Catch?**
>
> Sometimes people ask about Roehl's agreement. So here's the deal. We ask for your commitment in exchange for the value of our program. The value of the training is in effect a loan to you – a loan you'll never have to pay back if you simply complete the training and work as a heavy duty truck driver for 120,000 solo miles (about 15 months) after your training. We ask for your formalized agreement and we promise to hold up our end of the deal as well. We'll pay you to GET YOUR CDL™, provide you support and additional on the job training you need to be successful as a professional truck driver.

Roehl Jobs Site at 12 [Ex. 3]. Another variation on this disclosure is found in the Frequently Asked Questions portion of the website. *Id.* at 25 ("What's the catch?").

In addition to failing to communicate the amount of the so-called "loan" made to participants in the On-the-Job CDL Training Program, neither the website nor the Agreement clearly state that recruits will immediately owe Roehl the loan amount if Roehl unilaterally terminates them from the program. Nor do the website or the Agreement clearly state that the CDL Training Job is an at-will position, and that Roehl retains the right to terminate individuals' employment before they are able to reach the 120,000-mile mark, with or without cause. Roehl asserts that it will "hold up our end of the deal" by providing the training necessary to ensure the drivers are successful, as in the above-cited portion of the website, but does not specify whether

Roehl's "end of the deal" means providing Phase 1 CDL training, providing all three phases of training, or providing on-the-job training up to the 120,000 mile mark. *See* [Roehl ].

The Agreement itself, which recruits are required to sign at the job application stage, further fails to describe the consideration Roehl is providing in exchange for the "loan." Instead, it merely describes Roehl's commitment as follows: "In return for your admission to Roehl's SJSTP, Roehl will expend on your behalf the value of the SJSTP, which is equal to $7,000.00," and "Roehl will expend a significant amount of time, money, and effort to provide you with first class job training through our program, and the value of the SJSTP is also earned when you complete 120,000 paid solo miles." Harris Agreement [Ex. 5].

Instead of clearly disclosing that Roehl asserts the right to, and does, terminate drivers from employment even when they have not achieved 120,000 miles, thereby triggering the $7,000 repayment obligation, Roehl's affirmative representations, described below, convey the opposite impression.

In addition, Roehl makes statements in its advertisements about earning potential. For example, the website states in various places:

1. "If you are thinking about a CDL school, consider if that would require you to take out a loan to pay the course tuition, and still require you to job hunt after your licensing. Roehl provides job security and a way to earn $70,000+."
2. "Join Roehl Transport, and you can earn $900-$1500 every week."
3. "As of November 2024, Roehl drivers with at least one year on the job are averaging $1,360 a week (almost $70,700 a year). It's also important to know that the top 50% of Roehl drivers average $1,540 per week ($80k a year)."

Roehl Jobs Site at 8, 13, 21 [Ex. 3]. These statements of earnings are not accompanied by any description of the requirements that must be met to achieve this level of earnings. For example, these statements do not disclose that recruits will essentially exist in an extended probationary period up until they hit the 120,000 mile mark, nor do they disclose the reality that more than

half of all drivers do not make it to 120,000 miles because they have either quit or been terminated. Norlin Dep. [Ex. 1] 161:20-163:24.

### E. Advertisements and Written Documents: Affirmative Representations

Roehl's affirmative representations in its advertisements and other documents about the job and training program are misleading in their ambiguity, especially with respect to the dividing line, to the extent that it exists, between the training program, on-the-job training more generally, and employment for 120,000 miles.

Many of Roehl's statements about the On-the-Job CDL Training Program imply that Phase 3 of the program extends throughout the 120,000 miles. For example, on one of the first pages to which drivers are directed if they are interested in the CDL Training Job, Roehl states that "[a]fter the training program [the three-week CDL program] ends and you are officially licensed, you continue your on-the-job training at Roehl as one of our truck drivers with over-the-road training with a Roehl Driver Trainer!" Roehl Jobs Site at 8 [Ex. 3]. On the "Training Program Overview" page of the website, Phase 3 is described, but the duration is not clearly stated. For example, the website describes Phase 3 as follows:

> Phase Three is when you get your own truck and you'll be paid a mileage rate based on the fleet you select. In this last phase, you'll work with a fleet training manager that you'll talk to by phone each day. This manager will help you master the finer points of the job. Your weekly pay will be determined by how many miles you drive that week, and you'll receive your paycheck the week after you complete the work. You'll be on your way to earning $70,000 or more!

*Id.* at 12.

In the Conditional Offer Letter that is subsequently provided to the applicant, Phase 3 is described as "doing the job of a heavy-duty truck driver in your own truck and under the guidance of a Fleet Training Manager who is located at one of our terminals. From this point on

your compensation will be for the specific work you perform. The largest component being your mileage rate, and that is based on the Division and Fleet you are in." Offer Letter Email [Ex. 9].

The general impression established and anchored by these representations is that the job itself and the On-the-Job CDL Training Program extends for the duration of the 120,000 miles, which represents Roehl's "end of the deal."[4]

In light of the reality that Roehl retains the right to terminate drivers with or without cause, and exercises that right extensively, the following statements in Roehl's advertisements and recruiting materials form the basis for Plaintiff's claims of false, deceptive or misleading representations:

1. "Roehl provides job security."
2. "If you are an experienced trucker, a student driver who needs paid on-the-job training, or if you have no trucking experience but want your commercial drivers license to work in a stable and well-paid position at Roehl, don't delay - apply today!"
3. During Phase 3, "You'll be on your way to earning $70,000 or more!"
4. "Roehl Transport provides you with a sure path to success. Our paid CDL training is the fastest way to advance your career and go from zero experience to middle-class living. Join Roehl Transport, and you can earn $900-$1500 every week."

Roehl Jobs Site at 8, 13 [Ex. 3].

## III. Legal Standard

Class certification is appropriate where the named plaintiff's claims raise questions common to a group of individuals for whom joinder is impracticable, which claims are capable of generating "common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis removed), *quoting* Richard A. Nagareda.

[4] In another, less prominent place on the website, however, Roehl describes Phase 3 as lasting for approximately one month. Roehl Jobs Site at 18 [Ex. 3].

"Class Certification in the Age of Aggregate Proof," 84 N.Y.U.L. Rev. 97, 131-32 (2009). Class action plaintiffs must demonstrate that they have satisfied the requirements of Fed. R. Civ. P. 23(a) by showing there is numerosity, commonality, typicality, and adequacy. Additionally, the requirements of Rule 23(b)(3) – predominance and superiority – must be met.

A class must also be "ascertainable," meaning "a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). This means the class must not be "vague," or "defined by subjective criteria." *Id.* Ascertainability is not a concern here, because Roehl is capable of identifying all participants in its CDL Training Program who were terminated from the program after obtaining their CDL but before meeting the 120,000-mile commitment. Smit Decl. ¶¶ 4-5.

When evaluating a motion for class certification, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The federal rules of procedure are "to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits and to dispense with technical procedural problems." *Staren v. Am. Nat. Bank & Tr. Co. of Chicago*, 529 F.2d 1257, 1263 (7th Cir. 1976).

## IV. Class certification is warranted under Rule 23(a).

### A. The proposed class is too numerous for practicable joinder.

Rule 23 requires that the proposed class be too numerous for practicable joinder. Fed. R. Civ. P. 23(a)(1). While there is no "magic number" to find joinder impracticable, "a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Bemke v. Pechacek*, No. 21-CV-560-WMC, 2025 WL 1646984, at *3 (W.D. Wis. June 11, 2025), *quoting Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017). The class at issue in

this case, approximately 1,646 individuals, Smit Decl. ¶ 10, undeniably exceeds the threshold for practicable joinder.

**B. Common questions are central to the validity of each claim.**

Rule 23(a)(2) requires that a court find "a single common question of law or fact," the "truth or falsity" of which "will resolve an issue that is central to the validity of each claim." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015), *citing Dukes*, 131 S.Ct. at 2551, 2556. A "single common issue is sufficient to satisfy this requirement." *Blihovde v. St. Croix Cnty., Wis.*, 219 F.R.D. 607, 616 (W.D. Wis. 2003). "This is a permissive standard." *Id.* "The commonality requirement is satisfied when the defendant has engaged in standardized conduct towards members of the proposed class." *Borcherding-Dittloff v. Transworld Sys., Inc.*, 185 F.R.D. 558, 563 (W.D. Wis. 1999).

Here, Plaintiff asserts that Roehl has engaged in a standardized practice of recruiting drivers to apply for the CDL Training Job, using standardized language in its advertisements, derived from its website. Recruits apply to this job by completing a single common application with a uniform set of disclosures and authorization forms that drivers must sign before a recruiter contacts them to set up an interview. The loan repayment agreement is a standardized form that is included among the disclosures drivers must sign <u>before</u> being interviewed by a recruiter, which contains a uniform set of representations about the loan amount, the mileage commitment, and the consideration provided by Roehl. After the interview, Roehl has a standard practice of requiring drivers to complete drug testing before Roehl issues a standardized offer letter, which contains a uniform set of representations about the terms and conditions of the job. Roehl also engages in a uniform practice of attempting to collect $7,000 from drivers upon termination, and turning over the account to a collections agency if the driver does not immediately pay. This "common nucleus of operative facts," *Svoboda*, 168 F.4th at 961, will determine whether Roehl

violated ATCP § 116. This is sufficient to establish not only commonality but predominance. *See* Section V.A, *infra*.

Plaintiff further asserts that these standardized practices violate various provisions of the ATCP § 116. Defendant has disputed the applicability of ATCP § 116 to its recruiting methods and further disputes that it has violated any its provisions. *See* Def.'s Mem. at 12, ECF No. 40. Whether Plaintiff or Defendant is correct will be resolved by answering the following questions of law and mixed law-and-fact, which are quintessentially common:

1. Whether the loan repayment obligation is a "purchase or investment," within the meaning of ATCP § 116.01(5).
2. Whether the loan repayment obligation is one "that a recruit must make in order to obtain a work offer," within the meaning of ATCP § 116.02.
3. Whether Roehl's advertisements "clearly disclose" the "nature and amount" of the loan repayment obligation, as required by ATCP § 116.02.
4. Whether Roehl provides recruits with a written document containing all information specified in ATCP § 116.03 before the recruit agrees to the loan repayment obligation.
5. Whether Roehl makes disclosures required by ATCP § 116.04 in connection with all statements of potential earnings.
6. Whether Roehl makes false, deceptive or misleading representations in violation of ATCP § 116.05.

The first two issues were addressed by the Court in its decision denying Roehl's motion to dismiss Count I. First, the Court held that Plaintiff had sufficiently alleged that Roehl's standard practice of having recruits sign a loan repayment agreement before receiving a job offer was subject to the regulatory requirements imposed by ATCP § 116 on work recruitment schemes. Op. and Order at 12, ECF No. 44 ("defendant's recruitment scheme appears to be encompassed within the plain text of Wis. Admin. Code. § ATCP § 116"). This Court interpreted "purchase or investment" broadly and rejected Roehl's argument that "the regulation does not apply to the repayment Agreement, as it *only obligated plaintiff to pay* the training cost *after* her

employment terminated." *Id.* at 11 (emphasis in original) ("plaintiff has sufficiently alleged the required repayment under the Agreement falls comfortably into the definition of "purchase or investment" as defined by the regulation's text.").

The Court made this determination based solely on facts alleged in the complaint that may be proven by evidence that is common to the class, and it disposes of a key issue that "represent[s] a significant aspect of [the] case and . . . can be resolved for all members of [a] class in a single adjudication." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016) (certain alterations in original), *quoting Messner*, 669 F.3d at 815. Specifically, the Court relied on Plaintiff's allegation that " she was required to sign the Agreement obligating her to pay $7,000 to defendant as part of her application to obtain a work offer." Op. and Order at 10, ECF No. 44. The evidence developed to date demonstrates that this is a uniform, standardized practice, as confirmed by Roehl's VP of Driver Employment in deposition testimony. Norlin Dep. [Ex. 1] 66:21-68:9 ("When [a] candidate completes their employment application or anytime a modification is made to an employment application, they are queued to sign that application and any subsequent documents, including the agreement.").

Similarly, this Court also held that Plaintiff had "sufficiently alleged that the job *she* applied for *required* her to sign the Agreement before receiving an offer." Op. and Order at 11-12 (emphasis in original) (noting that "the burden remains on plaintiff to prove this as a matter of fact"). The evidence developed through discovery demonstrates that proof of this "requirement" will rely entirely on common evidence because the CDL Training Job is a distinct job position, and any applicant for that position must go to the same website and sign the same set of documents in order to complete an application, schedule a job interview, and ultimately receive a conditional job offer. *See* Section II.A, *supra*.

As for the next three disclosure issues, these are also common issues, which will be resolved based on common evidence.

ATCP § 116.02 requires any work advertisement to "clearly disclose . . . [t]he nature and amount of every purchase or investment that a recruit must make in order to obtain a work offer."[5] Because Roehl's representations about the CDL Training Program and job are all contained on a single website, from which any other postings are derived, *see* Norlin Dep. [Ex. 1] 60:4-10, the determination of whether these representations meet the clear disclosure requirement of ATCP § 116.02 is a common issue that requires no individualized inquiry.

ATCP § 116.03 requires the recruiter to spell out details about the "purchase or investment" in a "written document" that must be provided to the recruit "before the recruit agrees to make the purchase or investment." *Id.* (emphasis added). This written document must include, *inter alia*, the "nature of the purchase or investment, and the terms under which it is made," "the consideration given by the recruiter in return for the purchase or investment," and "[t]he terms and conditions of any work offer to which the purchase or investment is related." ATCP § 116.03.

Because applicants to the CDL Training job must agree to the loan amount of $7,000 as part of their application to the program, the only document that could be considered the requisite "written document" under ATCP § 116.03 is the Agreement itself. And because the Agreement [Ex. 5] is a uniform, take-it-or-leave-it contract that all applicants must sign, the only evidence that will be necessary to determine whether Roehl has complied with ATCP § 116.03 is the Agreement itself and common facts establishing the actual terms of the loan repayment

---

[5] ATCP 116 defines a "work advertisement" as "any solicitation or representation, other than a face-to-face statement, in which a recruiter invites one or more individuals to apply for work or accept a work offer." ATCP 116.01.

agreement, the actual consideration provided by Roehl to recruits, and the actual terms and conditions of the CDL Training job, which in relevant part are uniform to the class.[6]

ATCP § 116.04 states that "[i]f a recruiter makes any statement of potential earnings to recruits from whom the recruiter solicits any purchase or investment, the recruiter shall disclose . . . in connection with the statement . . . [*inter alia*] . . . Requirements which the recruit must meet in order to qualify for the stated earnings, including any training or probationary service requirement."

Roehl does, indeed, make statements of potential earnings to recruits. *See* Section II.D above. In light of these representations, the question is whether Roehl has complied with ATCP § 116.04 by adequately disclosing "in connection with this statement" the "[r]equirements which the recruit must meet in order to qualify for the stated earnings, including any training or probationary service requirement." The answer to this question requires no individualized inquiries, and simply requires an evaluation of the statements made by Roehl on its website as compared to the actual, uniformly applicable requirements for achieving those earnings.

Plaintiff intends to take the position in this litigation that one of the requirements that should have been disclosed in connection with these statements is the "probationary" element of the CDL Training Job, i.e., that the driver may be terminated by Roehl with or without cause at any time before reaching the 120,000 mile mark (and, relatedly, that those terminated before 120,000 miles will be liable for the $7,000+). Plaintiff anticipates that Roehl will take the opposite position, but the resolution of this dispute will not require any individualized analysis.

ATCP § 116.05 makes it unlawful for recruiters to, *inter alia*:

---

[6] While the specific mileage rates, home time provisions, etc. vary depending on whether the driver is hired into the flatbed, refrigerated, or dry van division, the question of whether the at-will nature of the position is clearly disclosed in the Agreement is common to the class.

1. Make any false, deceptive or misleading representation to that recruit.
2. Misrepresent the nature of the work which the recruiter offers or may offer to that recruit.
3. Misrepresent the nature or amount of earnings which a recruit may make.

On behalf of the putative class, Plaintiff intends to establish the asserted violations of ATCP § 116.05, *see* Section II.E *supra*, solely by reference to written statements contained on the Roehl's website and in its standardized emails to recruits.

The determination of whether Roehl's written representations are false, deceptive, or misleading, or whether they constitute misrepresentations, may be evaluated solely by reference to common evidence, including the representations themselves, as compared to Roehl's actual practices, combined with Roehl's own data showing the percentage of recruits who are terminated from the program, and the percentage of recruits who actually achieve those earnings. Because Roehl's recruiting materials and practices are standardized and uniform, they are common to the class.

**C. Plaintiff's claims are typical of the claims of those she seeks to represent.**

Rule 23(a)(3) requires that the claims of the representative plaintiff(s) be typical of the claims of the class. Typicality does not require claims to be identical; rather, they should share the same "essential characteristics" arising from the same "event or practice of conduct," and be based on the same legal theory. *Patrykus v. Gomilla*, 121 F.R.D. 357, 360 (N.D. Ill. 1988), *quoting* H. Newberg, Newberg on Class Actions § 1115(b) (1st Ed.1977).

Plaintiff Harris's claims are typical of the claims of the class. She was recruited into the CDL Training Job by same set of representations and recruiting practices as all members of the putative class. Like other members of the proposed class, she had obtained her CDL and had proceeded to the subsequent phases of the program before she was terminated from the program. Like other members of the proposed class, because she was terminated before reaching 120,000

miles, she immediately owed Roehl $7,000. Because of the "formulaic behavior" of Roehl with respect to Plaintiff and the proposed class, the typicality requirement has been satisfied. *Costello v. BeavEx Inc.*, 303 F.R.D. 295, 306 (N.D. Ill. 2014) (named plaintiffs' claims were typical of class of delivery drivers), *aff'd in part, vacated in part, remanded*, 810 F.3d 1045 (7th Cir. 2016) (finding predominance established as well).

**D. Plaintiff and her counsel are more than adequate representatives of the class.**

"Adequacy has two components, one that relates to the named plaintiffs and one that relates to class counsel." *Reilly v. Century Fence Co.*, No. 18-CV-315-JDP, 2020 WL 1166708, at *8 (W.D. Wis. Mar. 11, 2020). The named plaintiff must show that her "claims are not in conflict with the claims of the proposed class and that [s]he has a sufficient interest in the outcome of the case." *Id.* Here, Plaintiff does not have any conflicts with the proposed class. She is a member of the class she seeks to represent and is pressing the same claims and the same legal theories for the proposed class as for herself. Any favorable rulings or recovery she (or her counsel) obtains will benefit the proposed class. In addition, Plaintiff has vigorously pursued this litigation by obtaining counsel, responding to written discovery requests, producing documents, and sitting for a deposition.

As for Plaintiff's attorneys, "Rule 23(g)(1) sets forth four factors that a court must consider before appointing class counsel: the quality of counsel's work in the case; counsel's experience in handling similar cases; counsel's knowledge of the law; and the resources that counsel can devote to the case." *Id.* Plaintiff's attorneys are experienced class action litigators, with extensive experience litigating against trucking companies, who are amply qualified to

pursue this lawsuit[7] and have done so to date. As other courts have concluded, the undersigned attorneys are qualified to serve as class counsel for drivers bringing similar claims.[8]

## V. The requirements of Rule 23(b)(3) are satisfied.

### A. The numerous common issues in this litigation will predominate over any individualized inquiries.

Rule 23(b)(3) permits class certification where the "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." This inquiry "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hills v. Essentia Health*, No. 19-CV-907-WMC, 2021 WL 6072560, at *8 (W.D. Wis. Dec. 23, 2021), *quoting Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Central to this inquiry is whether the claims 'arise from a common nucleus of operative facts and issues.'" *Svoboda v. Amazon.com Inc.*, 168 F.4th 956, 961 (7th Cir. 2026) (upholding certification of biometric statute class). "The presence of individual questions does not prevent a common issue from predominating unless those individual questions overwhelm the questions common to the class." *Coetzee v. Shell Lake Health Care Ctr. LLC*, No. 21-CV-337-WMC, 2023 WL 1274371, at *3 (W.D. Wis. Jan. 31, 2023). "Stated another way, an <u>individual question does not predominate</u> where common questions of law and fact relevant to liability otherwise generate

---

7 Counsel's professional background and credentials are set forth in the declarations that accompany this filing.

8 *See Roman v. Triton Logistics, Inc.*, No. 23 CV 15146, 2025 WL 1134191, at *8 (N.D. Ill. Apr. 16, 2025) ("Roman's counsel are experienced class action litigators with experience in wage and hour, misclassification, and driver cases."); *Roberts v. TransAm Trucking, Inc.*, No. 21-2073-JWB, 2023 WL 6376756, at *32 (D. Kan. Sept. 29, 2023) ("Plaintiffs' counsel . . . have demonstrated that they will prosecute the action vigorously on behalf of the class. Further, they . . . have demonstrated that they have experience in handling class actions, and have knowledge of the applicable law"); *Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252 (D. Mass. Jan. 10, 2022) (attorneys are "well-qualified to prosecute the case"); *see also Moore v. Wilson Logistics, Inc.*, No. 21-03212-CV-S-BP, 2022 WL 22961415, at *6 (W.D. Mo. Nov. 14, 2022) (certifying nationwide Rule 23 class and conditionally certifying FLSA collective); *Nyachira v. New Prime, Inc.*, No. 21-03211-CV-S-BP, 2022 WL 19239768, at *6 (W.D. Mo. Nov. 7, 2022) (certifying nationwide Rule 23 class after previously conditionally certifying FLSA collective action); *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 425 (D. Mass. 2018) (certifying nationwide Rule 23 class(es) of truck drivers as well as conditionally certifying FLSA collective action).

significant efficiencies and the individual question is manageable." *Svoboda*, 168 F.4th at 964 (emphasis added).

Here, common issues predominate because the critical legal and factual questions in this case either have been resolved on a class-wide basis at the motion to dismiss stage (whether ATCP § 116 is generally applicable to Roehl's recruitment practices), or may be resolved on a class-wide basis, using common evidence (whether Roehl has violated various substantive provisions of ATCP § 116). *See* Section IV.B *supra*.

As in other similar cases involving training repayment agreements, resolution of the common factual and legal issues will "generate significant efficiencies," *Svoboda*, 168 F.4th at 964. *See, e.g.*, *Fredericks v. Ameriflight, LLC*, No. 3:23-CV-1757-X, 2024 WL 4887528, at *4 (N.D. Tex. Nov. 25, 2024) ("The Court agrees with Fredericks that the pilots who trained on the same aircraft as she did and signed a repayment agreement for the same terms (cost and duration) have common questions that predominate."); *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 425 (D. Mass. 2018) ("Semantics aside, the core theory remains the same: CRST misled drivers about the true costs of the Driver Training Program, in violation of the Consumer Frauds Act. That theory, on its face at least, is amenable to class-wide testing."); *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 520 (D. Utah 2017) ("Finally, Plaintiffs proffered evidence of a centrally-driven recruitment program with training scripts and 'talk tracks' designed to induce enrollment in driver training schools and subsequent purchase of the Driving Opportunity. The record thus reflects a concerted pattern of representations that uniformly misrepresented the opportunities that awaited an independent contractor. Accordingly, the court concludes the fraud-based claims are susceptible to class treatment."). In all of these cases, the common questions overwhelmingly predominated over any individualized inquiries.

Nevertheless, Plaintiff anticipates that Defendant will oppose this motion for class certification on grounds that the establishment of pecuniary loss and causation of that loss will be predominated by individualized inquiries. Here, as in the above-cited cases, any individualized inquiries are minimal and easily handled by routine class action management procedures. *See Svoboda*, 168 F.4th at 966.

**1. Plaintiff will be able to establish class-wide pecuniary losses using common evidence.**

Wis. Stat. § 100.20 allows "[a]ny person suffering pecuniary loss . . . [to] sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss." Wisconsin courts look to the purpose of the regulations promulgated under the DTPA to determine which pecuniary losses are cognizable a result of violations. *Pliss v. Peppertree Resort Villas, Inc.*, 2003 WI App 102, ¶ 21, 264 Wis. 2d 735, 749. Wisconsin courts have consistently determined that "purchase price" is a proper measure of pecuniary loss, regardless of whether the purchase was made in cash or on credit, and regardless of consumers' actual, out-of-pocket losses. *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 979 (1996); *Pliss*, 2003 WI App 102, ¶ 21; *Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.*, 2009 WI App 65, ¶ 17, 318 Wis. 2d 802, 814. Wisconsin courts have also held that the term "pecuniary loss" in Wis. Stat. § 100.20 incorporates the concept of "expectation damages" under contract law. *Benkoski v. Flood*, 2001 WI App 84, ¶ 25, 242 Wis. 2d 652, 669.

In *Hughes,* the Supreme Court of Wisconsin explicitly rejected defendant's argument that "a buyer's pecuniary loss is limited to the buyer's out-of-pocket expenses that were caused by the manufacturer's violation of the statute." *Hughes*, 197 Wis. 2d at 979. Rather, the Court held, "pecuniary loss includes the full purchase price of the vehicle to the consumer," regardless of whether the consumer pays the full purchase price in cash <u>or on credit</u>. *Id.* To hold otherwise, the

Court reasoned, would mean that the same behavior by the manufacturer would result in $40,000 in double damages where a consumer had paid the full $20,000 purchase price, but only $4,000 in double damages where a consumer had paid $2,000 as a downpayment and had yet to make the remainder of the payments to a secured creditor. The manufacturer would be on the hook for "the unpaid principal and any interest owed," but the "amount owing to the secured creditor would not be subject to doubling." The Court held that "[t]his result is <u>inconsistent</u> with the legislative goal of encouraging manufacturers to deal promptly and fairly with all purchasers of new vehicles." *Id.* (emphasis added).

The lesson of *Hughes* and its progeny is that the formulation of a violation's pecuniary loss must be derived from the purpose of the regulation, considered in light of the remedial purpose of Wis. Stat. §100.20, and with the goal of "encouraging consumers to enforce their rights and deterring prohibited conduct through liberal private remedies" at the forefront of the analysis. *Kaskin*, 2009 WI App 65, ¶ 25.

Applying these principles to the present matter, the Court must start with the purpose of ATCP § 116, which sets forth various requirements and prohibitions that are intended to ensure that workers who are recruited into jobs that require a purchase or investment are able to do so with informed consent. These requirements are not mere technicalities; they are attempts to combat commonly used sales and recruitment tactics, including, *inter alia*, "misleading door openers" and other forms of "drip pricing." *See Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024), *quoting Trade Regulation Rule on Unfair or Deceptive Fees*, 88 Fed. Reg. 77420, 77432 (proposed Nov. 9, 2023), *codified at* 16 C.F.R. § 464, and *citing Hettinger v. Bozzuto Mgmt. Co.*, No. CV 23-3687 (JEB), 2024 WL 1833855, at *5 (D.D.C. Apr. 26, 2024).[9]

---

[9] "By disclosing only the fixed rent at the time of advertising and application, and revealing utility fees only after the potential tenant has paid hundreds of dollars via an application fee and deposit, Bozzuto engages in a

In light of this purpose of ATCP § 116, the following forms of pecuniary loss are likely to be recognized by the Supreme Court of Wisconsin[10]: purchase price, expectation damages (lost wages), difference-in-value damages, and suppressed wages. All of these forms of pecuniary loss are amenable to class proof.

***a) Purchase price***

Pursuant to *Hughes*, *Pliss*, and *Kaskin*, the appropriate measure of pecuniary loss for drivers who were improperly induced to enter the CDL Training Program by Roehl's ATCP § 116 violations is the "purchase price" of the program, *i.e.*, the amount of the repayment obligation ($7,000), regardless of whether the terminated driver immediately repaid the full amount of $7,000 or failed to make any payment and was put into collections. This amount should be doubled per Wis. Stat. § 100.20(5), before any offsets are applied. *Heiman v. Roe*, 2022 WI App 57, ¶ 30, 2022 WL 14177251 at *7 (2022) (unpublished op.); *Benkoski*, 242 Wis. 2d at 676.[11]

Roehl has detailed records of program participation dates, the reason for termination, the amount owed upon termination, and the amount collected, *see* Smit Decl. ¶¶ 4-5, all of which make this measure of pecuniary loss highly amenable to class treatment.

***b) Expectation damages (lost wages resulting from early termination by Roehl)***

Another form of damages that Wisconsin courts have recognized under Wis. Stat. § 100.20 is expectation damages, i.e., the "net gain [Plaintiff] would have realized from the

practice that makes a reasonable tenant more likely to follow through with the transaction and pay more than initially anticipated, as opposed to starting her search anew." *Hettinger*, 2024 WL 1833855, at *5.

[10] *See* Op. and Order at 8, ECF No. 44 ("Sitting in diversity, this court 'must apply state law as [it] believe[s] the highest court of the state would apply it if the case were now before that tribunal.'") (alterations in original), *quoting Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024).

[11] This is a fair result with respect to class members who have not yet made payments toward the $7,000 repayment obligation because they have repayment obligations to a third-party debt collector.

contract but for the failure of [Roehl] to perform." *Heiman*, 2022 WI App 57, ¶ 41. Where "a party is prevented from fully performing a contract, it is entitled to recover the profits it would have realized by performing, that is, the difference between the contract price and what it would have cost the party to perform." *Thorp Sales Corp. v. Gyuro Grading Co.*, 111 Wis. 2d 431, 440 (1983). This form of damages is also recognized in strict responsibility misrepresentation cases. *See Benjamin v. Dohm*, 189 Wis. 2d 352, 360–61 (Ct. App. 1994) ("Strict responsibility misrepresentation provides a purchaser with the measure of damages representing the difference between the fair market value of the property in the condition when purchased and the fair market value of the property as it was represented, or the benefit of the bargain.").

Here, putative class members were "prevented from fully performing" their part of the contract, because they were terminated by Roehl before they could complete their 120,000 miles and were deprived of the concomitant wages. Expectation damages is an appropriate approach to pecuniary loss because Roehl's failure to fully describe "[t]he consideration given by the recruiter in return for the purchase or investment," ATCP § 116.03, in the loan repayment agreement allows Roehl to reap the benefit of an impression that Roehl is promising to employ drivers for 120,000 miles, while not formally binding Roehl to do so.

Plaintiff and the putative class reasonably expected to be able to complete 120,000 miles (approximately 15 months of paid work), since that is what Roehl wanted them to believe, and therefore their losses are properly formulated as the wages they could have expected to earn had they not been terminated by Roehl. This measure of damages is routinely recognized in class employment cases, and may be easily determined from Roehl's records of average driver earnings. *See, e.g., Eirhart v. Libbey-Owens-Ford Co.*, 996 F.2d 837, 842 (7th Cir. 1993)

(affirming award of damages "measured from the JSCMs' layoff date for lost wages and benefits from their other employment").

***c) Difference-in-value damages***

Difference-in-value is another recognized measure of pecuniary loss under Wisconsin law. *Russo v. BRP US Inc.*, 737 F. Supp. 3d 649, 658 (E.D. Wis. 2024) (recognizing that the "difference in value [could] represent the damages owed to each class member" in express warranty case brought under Wis. Stat. § 402.313); *Benjamin*, 189 Wis. 2d at 360–61 ("The measure of damages awarded to a party who successfully litigates a claim for negligent misrepresentation is the difference between the fair market value of the property at the time of the sale and the amount actually paid, or the out-of-pocket rule."). This measure of damages is similar to what has been recognized as the appropriate measure of loss in False Claim Act cases by federal courts. *See, e.g., United States ex rel. Heath v. Wisconsin Bell, Inc.*, 808 F. Supp. 3d 917, 928 (E.D. Wis. 2025) (holding that government loss may be measured by "the difference between the contract price and the *quantum meruit* value of the contractor's performance," recognizing that "if the government had refused to pay for the contract [due to the fraud], the liable party would still be able to recover the value of its performance under *quantum meruit*").

In the context of Roehl's failure to disclose the amount of the repayment obligation in work advertisements, the difference in value may be measured by the difference between the value of what class members actually received and the value that Roehl represented it would provide them ($7,000). This formulation of the harm flowing from the failure to disclose a training repayment amount was adopted by a District Court in another jurisdiction considering a similar claim under Iowa's consumer protection statute. *See, e.g., Montoya*, 2020 WL 2850235, at *1 (D. Mass. June 2, 2020) ("Montoya is likely to succeed in proving that the cost of tuition paid by CRST for Phase 1 [CDL] training was, at a maximum, $2,500 per student, and that

CRST is not permitted to recover a 'training fee' from drivers that exceeds the actual cost of tuition.").

As applied in the context of Wis. Stat. § 100.20, which requires doubling damages before any offset, the difference-in-value approach would result in those members of the putative class who actually repaid the $7,000 being deemed entitled to recover that amount to make them whole and an additional $7,000 in double damages. But because Roehl has provided them with something of value (*e.g.*, CDL training resulting in a CDL), Roehl could be allowed to recover that value, under a *quantum meruit* theory as an offset, once damages are doubled. Roehl's offset would need to be capped at $7,000 (the "contract price"), otherwise Roehl would recover more than provided for by the loan repayment agreement.

As for those members of the putative class who did not repay Roehl immediately, they would be entitled to the same recovery as those who did make the repayment, except that they would additionally need to be compensated for the collections costs ($1,332) charged by the third-party debt collector. This would be sufficient to make those class members whole, because they would be able to pay off the third-party debt collector and close out the collection accounts on their credit reports. They would retain the difference between their double damages and Roehl's offset based on the *quantum meruit* of the training provided.

This is a fair and viable approach, which would require minimal individualized inquiry. This is so because Plaintiff can demonstrate, based on common evidence, that Roehl itself values each component of the On-the-Job Training Program in discreet amounts. For example, Roehl plainly values the CDL portion of the training (Phase 1) at $3,870, which is the difference between the $7,000 repayment obligation under the On-the-Job CDL Training Program and Roehl's representations about the value of the On-the-Job Training Program to recruits who

obtained their CDL from a third party. *See* Milford Agreement [Ex. 13]. This Court could deem Roehl to be entitled to this amount as an offset, but allow Roehl to pursue additional amounts based on the phase during which Roehl terminated the driver. Roehl's records on which its own valuation of program value are based, combined with its records of individual drivers' tenure and repayment amounts, as well as its assessment of average profits per driver week, would be sufficient for a factfinder to determine the appropriate offset for each class member.

***d) Suppressed wages***

Economic theory suggests that training repayment agreements may "suppress worker mobility, and therefore wages." Class Certification Report of Augustus H. Urschel, *Fredericks v. Ameriflight*, No. 3:23-cv-01757-X (N.D. Tex.), ECF No. 98-20 at ¶ 26 ("firms require employees to sign restrictive employment agreements like TRAPs so that the firm has some guarantee that the employee will remain with the firm after it has invested employee-specific training. But the act of curtailing an employee's outside employment options introduces frictions into the labor market, weakens the worker's bargaining position, and reduces competition over pay."). Although economic theory also predicts that workers could "demand higher wages in return for the restriction," *id.* at ¶ 28, the reality is that these "'employers almost always unilaterally impose noncompetes …without any meaningful negotiation or compensation' because of their 'superior bargaining power.'" *Id.* at ¶ 30, *quoting* Non-Compete Clause Rule, 89 Fed. Reg. 38342, 38375 (May 7, 2024). If an employer engages in techniques to impede workers from noticing or paying attention to the agreement, this further limits the ability of workers to negotiate a wage commensurate with the repayment obligation. *Cf.* Non-Compete Clause Rule, 88 Fed. Reg. 3482, 3503 (proposed Jan. 19, 2023).

Wage suppression can be measured using the "well-accepted methodology" of "yardstick analysis," whereby "an economist would compare the pay at the firm with the Challenged

Conduct to similarly situated firms where the Challenged Conduct is absent." Urschel Report at ¶ 54 ("The degree to which a yardstick candidate is reliable depends upon how similar the proposed yardstick firm is to the target firm (aside from the Challenged Conduct). Thus, the role of the economist would be to identify one or more potential yardstick candidates and to make any necessary adjustments to account for differences between the firms."). In other words, the effect of Roehl's repayment obligation on the wages it pays to recruits is "capable of being evaluated on a classwide basis using evidence and methods common to all [c]lass [m]embers."

This approach to measuring wage suppression is particularly appropriate here, where Roehl itself participates in and uses wage studies to determine the wages to set. As Roehl's Vice President of Driver Employment testified, "There are a number of wage studies that come out on a routine basis and . . . we participate in those." Norlin Dep. [Ex. 1] 22:4-20. "I am involved in setting driver pay at Roehl. I do the competitor analysis and determine where we are, whether our pay rates are competitive or not." *Id.* 167:7-168:16. When evaluating its competition, Roehl itself focuses on "a few dozen" large truckload carriers. *Id.* 20:1-20. The existence of routine wage studies, a pool of readily identifiable potential yardstick candidates, and the fact that Roehl is "definitely not the highest-paying carrier out there," *id.* 21:10-11, ensure sufficient variation and makes this a viable approach to measuring whether and to what extent wage suppression is a result of the $7,000 repayment obligation.

**2. Plaintiff will be able to establish that Roehl's violations of ATCP § 116 caused pecuniary loss using common evidence.**

The question of causation is also amenable to class treatment, as Wisconsin courts have repeatedly held in the context of defining pecuniary loss. This is so because, *inter alia*, Wis. Stat. § 100.20, like § 100.18, "does not require reasonable reliance." *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2006 WI App 148, ¶ 42, 295 Wis. 2d 298, *affirmed*, 2007 WI 70,

301 Wis. 2d 109. "Under the DTPA . . . 'the test . . . for determining whether a representation caused pecuniary loss is '[w]hether plaintiff would have acted in its absence.''" Op. and Order, ECF No. 44 at 12-13, *quoting Grand View Windows, Inc. v. Brandt*, 2013 WI App 95, ¶ 21, 349 Wis. 2d 759, 773. In the context of a misrepresentation prohibited by regulation, a causal connection is established where the representation is a "material inducement" or a "significant factor." *K & S Tool*, 2006 WI App 148, ¶ 42.

Other regulations promulgated under Wis. Stat. §§ 100.18 and 100.20, including ATCP § 116, require that certain representations be made prior to a sale, thereby codifying "a concept of 'informed consent,'" which is "an integral part of consumer protection law." *Kaskin,* 2009 WI App 65, ¶ 17. The Court in *Kaskin* held that, where a consumer had been deprived of the right of informed consent before giving money to a repair shop, the consumer's pecuniary loss – in the amount of the money given to the repair shop – was caused by the violation. *Id*. at ¶ 28 ("It is not the consumer's burden to prove that he or she would have done something differently had the proper information been given."). In other words, the consumer in *Kaskin* did not need to prove that he would have acted differently had he been fully informed of the cost.

Similarly, in *Pliss*, the Court held that where a defendant "improperly induced" a consumer transaction, by allowing the sale to occur before compensation of the referrals provided (the violation), causation of the pecuniary loss (the purchase price), had been sufficiently established. *Pliss*, 2003 WI App 102, ¶ 21.

Both *Kaskin* and *Pliss* involve regulations that, in essence, define the prohibited actions as forms of improper inducement, thereby establishing the causal link to the pecuniary loss. In other words, the regulation seeks to prohibit the cause of consumer's pecuniary loss. *See Kaskin*, 2009 WI App 65, ¶ 15 ("Therefore, using the common understanding of the term 'because of,'

we think that the 'monetary' or 'pecuniary loss' is clearly the amount suffered to be paid as a result of the violation of the code. There is nothing, either in the statute or the code, which says that the consumer must prove something different. We are constrained from adding words to a statute that are not there."), *quoting Fond Du Lac County v. Town of Rosendale*, 149 Wis. 2d 326, 334 (Ct. App. 1989).

*Grand View* is not to the contrary. In *Grand View*, the Court of Appeals addressed the causal connection between a jury award of $250 and a violation of ATCP 110.02(7)(c), which requires a seller "to give the buyer timely notice of any impending delay in contract performance." 2013 WI App 95, ¶ 8. None of the testimony presented to the jury by the buyer about the shoddy work performed, and the damages flowing from that shoddy work, supported a conclusion that the seller's failure to provide timely notice of delays caused any of those any damages. *Id.*, ¶ 33. Unlike ATCP § 116, or the regulations at issue in *Pliss* and *Kaskin*, the provision at issue in *Grand View* was not aimed at improper inducement, but rather a seller's behavior during the performance of a contract.[12]

With respect to the regulatory provisions for which Plaintiff seeks class certification, by proving the violation, which Plaintiff has demonstrated can be accomplished using common evidence, Plaintiff will be able to prove the causal element, *i.e.*, improper inducement. *See also Roberts*, 318 F.R.D. at 514 ("common sense dictates that each class member's reason for attending driving school and joining the independent contractor program was the belief that Defendants offered an income and mileage opportunity that would support a career.").

---

12 Notably, in *Grand View*, the jury found no violation of "ATCP 110.02(11) (misrepresentations to induce a contract or payment)." *Id.*, ¶ 8.

**B. A class action is superior to other methods of adjudicating this matter.**

Rule 23(b)(3) requires that a class action be superior to other available methods for adjudicating the controversy, taking into consideration "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." "It is enough that class treatment is superior because it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615. Here, the alternative to a class action is to require hundreds of individuals to forego recovery, file their own lawsuits, or join this case as party-plaintiffs, none of which are superior options.

First, the overwhelming majority of individuals in this putative class are unlikely to bring claims individually due to the hurdles they would encounter, irrespective of their potential recovery. "[W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case. Those transaction costs are not insubstantial and have prompted other courts" to find class litigation to be superior. *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 464 (S.D.N.Y. 2007).

Second, the "court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class." *Zuniga v. Bernalillo Cnty.*, 319 F.R.D. 640, 681 (D.N.M. 2016). Class certification is superior because it has the potential to alert class members who may lack

knowledge of their rights to the possibility of filing suit individually. *Id.* ("receipt of the class notice will spur them into action, and they will opt out of the class.")

Third, class actions serve the critically important purpose of "prevent[ing] violators" of a remedial statute from "limiting recovery to a few individuals where actual, wide-spread noncompliance is found to exist." *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974). In essence, class actions "permit citizens to function as private attorneys general." *Skirchak v. Dynamics Rsch. Corp.*, 508 F.3d 49, 58 (1st Cir. 2007). Wis. Stat. § 100.20 is a remedial statute, the legislative aim of which is advanced by class litigation. *Cf. Harwood v. Wheaton Franciscan Servs., Inc.*, 2019 WI App 53, ¶ 54, 388 Wis. 2d 546, 574 ("it is considered to be in the public interest as declared by the legislature to permit class actions when the prerequisites are satisfied").

Fourth, class treatment would be more economical and efficient than individual proceedings. Allowing putative class members to benefit from the hard-earned discovery obtained to date by Plaintiff is superior to the alternative, which would require individual class members to find their own counsel and file their own claims, only to procure and rely on the same body of evidence. It is, therefore, a better use of the Court's and the parties' resources to resolve as many of the common legal issues arising from that evidence on a class basis than to require thousands of individuals to do the same in repetitive, duplicative fashion, which "would have a 'staggering' impact on our court system." *Hammetter v. Verisma Sys., Inc.*, 2021 WI App 53, ¶ 24, 399 Wis. 2d 211, 230.

Fifth, the inherent imbalance of power between Roehl and the drivers reinforces the superiority of class treatment. The members of the proposed class work in an industry where

"blacklisting" is all too easy and all too common.[13] Concerns about employer retaliation justify a finding of superiority. *See, e.g.*, *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 406 (D. Mass. 2017) (class action was superior because "fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis.").

## VI. Conclusion

For the reasons set forth herein, Plaintiff respectfully requests that the Court (a) certify a class consisting of "all individuals who have been hired into Roehl's On-the-Job CDL Training Program Truck Driving Job and have been terminated by Roehl after obtaining their CDL and before completing 120,000 miles, since March 26, 2022"; (b) appoint Plaintiff Rachelle Harris as class representative; and (c) appoint Fair Work, P.C. as class counsel.

---

[13] *See, e.g.*, *US Labor Dept's OSHA Orders Mo. Trucking Co. to Pay More Than $100,000 to Blacklisted Driver From N.J.*, USDL 13-2425-NEW (OSHA 14-002) (company "submitted damaging and misleading information about his employment to a provider of pre-employment and drug testing screening services").

Respectfully submitted,

RACHELLE HARRIS,
individually and on behalf of
all others similarly situated,

By their attorneys,

*/s/ Rachel Smit*

Hillary Schwab, WIWD # N/A
Rachel Smit, WIWD # N/A
Brook S. Lane, WIWD *admission pending*
Attorneys for Plaintiff
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
Telephone: (617) 607-3260
Email: hillary@fairworklaw.com
rachel@fairworklaw.com
brook@fairworklaw.com

Dated: June 15, 2026